# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| CHISHOLM TRAIL DEVELOPMENT, LLC, ET AL., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | NO. CIV-15-0633-HE |
| ARVEST BANK, | ) ) ) | |
| Defendant. | ) | |

## ORDER

Plaintiffs Chisolm Trail Development, LLC ("Chisolm") and Aria Development, LLC ("Aria") brought this case against defendant Arvest Bank ("Arvest"), asserting state law claims for breach of contract and promissory estoppel. Arvest has moved for summary judgment on both claims.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.Pro. 56(a). Material facts are those that "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* And in determining whether this standard is met, the court views the evidence in the light most favorable to the non-moving party. Estate of Booker v. Gomez, 745 F.3d 405, 411 (10th Cir. 2014).

Background

The underlying facts and circumstances are substantially undisputed. Chisolm and Aria are companies owned by the same two individuals. In May 2014, the companies and their principals began discussing a loan from Arvest to finance the purchase and development of a 40-acre tract near Chickasha. The financing from Arvest was sought in the name of Chisolm, although the property was eventually acquired through Aria.

The purchase price for the property was $3,500,000, with substantial additional sums necessary to accomplish the development. By October 2014, the discussions had progressed to the point where Chisolm sought a loan from Arvest in the amount of $8,424,000. The loan request was considered by Arvest personnel and was eventually approved in December 2014. The approval was memorialized by a loan commitment letter (the "Letter") dated December 24, 2014.[1]

Subject to various contingencies, the Letter obligated Arvest to loan $8,424,000 to Chisolm, with repayment to be secured by the land, a mortgage on other property owned by Chisolm's principals (the "Westridge Farms" land), and assignment of the right to receive certain payments flowing from tax increment financing and sales tax abatement. The principals of Chisolm and Aria would also guarantee the loans. Among the contingencies

---

[1]*The Letter addressed financing for both the acquisition of the 40 acres and its development for retail businesses and for construction of a shopping center. The loan attributable to the acquisition and retail development is the basis of the dispute in this case.*

2

was a requirement that the loan meet a 75 % loan to value ratio, which required an appraisal of the 40 acres. The Letter also included a provision that if the loan was not finalized and disbursed by January 31, 2015, Arvest would thereafter "have the unilateral right to terminate all obligations of [Arvest] under this Loan Agreement" by service of written notice on Chisolm.

Two appraisals were done of the 40 acres. One preceded the issuance of the Letter and appraised the "as complete" value of the tract at $6,400,000. That was insufficient to support the amount sought by plaintiffs and a second appraisal was obtained on December 30, 2014, indicating a tract value of $9,250,000. That value was also insufficient to support a loan of the amount plaintiffs sought, and would support a loan of only $6,937,500, 75% of the appraised value. After some discussion of alternatives, plaintiffs indicated "we are okay at $6,937,500." The parties apparently went forward on that basis. It is undisputed that the overall acquisition and development costs would substantially exceed $6,937,500, with plaintiff obligated to provide the additional amounts necessary to complete the project.[2]

Efforts to finalize the loan then went forward, eventually leading to an email from David Snell of Arvest to plaintiffs on February 12, 2015. That email is the focal point of the present dispute. It indicated that the attorneys were working on the final loan documents, and

---

[2]*It is not altogether clear what completion costs the parties contemplated after the second appraisal and the reduction of the loan amount to $6,937,500, but it is undisputed that plaintiffs originally budgeted $10,530,000 to complete the project. It also appears undisputed that the parties still contemplated a "20% injection" into the deal by Chisolm.*

3

were trying to determine "how/where does your 20% injection into the project begin." It outlined three possible ways for the injection to occur, acknowledged that "This isn't something we previously discussed and actually laid out a plan for . . ." and invited plaintiffs' thoughts and ideas as to how to structure it. Plaintiffs offered a few suggestions, but ultimately informed Arvest that they would be seeking financing elsewhere. Plaintiffs then filed this lawsuit, arguing that Arvest repudiated the parties' agreement.

<u>Analysis</u>

Plaintiffs generally argue the Snell email was an effort to add a new term to the agreement which was contrary to what had already been agreed on and that, by sending the email, Arvest repudiated the contract represented by the Letter. Arvest argues that addressing the mechanics of plaintiffs' equity injection did not change the agreement, but simply filled in a gap not specifically addressed in the Letter.

Under Oklahoma law, a party repudiates a contract if they declare or demonstrate that they will not perform the agreement. That repudiation constitutes a breach of the agreement allowing the other party to pursue a remedy in damages. *See* <u>Bourke v. W. Bus. Prods., Inc.</u>, 120 P.3d 876, 883 (Okla. Civ. App. 2005). The repudiating party must have made a "distinct, unequivocal, and absolute declaration of an intent not to perform." *Id*. It is difficult to read the February 12, 2015 email as meeting that standard.[3] However, the bigger

---

[3]*Plaintiffs characterize the email as requiring the 20% to be paid in cash at closing. The email cannot plausibly be read to "require" any particular means of equity injection.*

problem for plaintiff is that, whether based on a theory of anticipatory repudiation or of straightforward breach of contract, the contract alleged to have been breached must have been sufficiently definite to make it enforceable.

An enforceable, valid contract requires a meeting of the minds on all of the material elements of the contract. Watkins v. Grady Cnty. Soil & Water Conservation Dist., 438 P.2d 491, 494 (Okla. 1968). "[W]here some of the material terms and conditions of the agreement are still unsettled and are reserved for negotiations, no completed contract is created." Mid-Continent Petroleum Corp. v. Russell, 173 F.2d 620, 622 (10th Cir. 1949) (citing Griffin Grocery Co. v. Kingfisher Mill & Elevator Co., 32 P.2d 63, 66 (Okla. 1934)). Here, the Letter includes this language:

> The foregoing terms outline the certain material elements to the loan, but are not intended to be the detailed statement of all the terms of the loan. After the acceptance of this loan commitment, we will instruct our attorneys to prepare definitive agreements (the "Loan Documents") which will set forth all the terms of the Loan. While the loan documents will contain the foregoing provisions, the remainder of their terms will be subject to the mutual approval of the Borrower and the Lenders.

The Letter then goes on to list several examples of matters reserved for further discussion or agreement.

Plaintiffs read the reference to "the certain material terms" as meaning "these are all the material terms" — and argue that the references in the Letter are an exclusive listing of material terms. But that reading is not supported by the language used. As noted above, the same paragraph goes on to say "While the loan documents will contain the foregoing

5

provisions . . ." there are other provisions that will be subject to further negotiation. In other words, it is "certain" that the particular provisions included in the Letter will be included in the final loan documents, but they are not the only ones that will be included.

Plaintiffs argue that the nature of their equity injection had been worked out in prior negotiations and that the other collateral (mortgage on Westridge Farms and the tax incentive funds) represented their equity injection. Response Brief [Doc. #73] at 18. But they cite nothing in support of that assertion and it appears plainly inconsistent with the Letter's focus on the "completed" value of the project. Plaintiffs knew the project would take millions in excess of the loan to complete, and the Letter indicated that the loan to value ratio would be computed based on only the 40 acre tract, not the other collateral.[4]

It is clear that a substantial equity injection by plaintiffs was contemplated by all parties, even if only after the loan funds were exhausted. It is also clear that the Letter did not address the mechanics of the injection one way or the other — it did not adopt either the "put it in at the end to complete the project" approach which plaintiffs prefer or some approach such as Arvest suggested in the email. The issue was not addressed in the letter and was among those matters left for further negotiation and resolution. As a result, the undisputed facts show the absence of the sort of definite, enforceable contract as would be necessary to plaintiffs' anticipatory repudiation theory.

---

[4]*The Letter identifies the Westridge Farms property as "abundance of caution" collateral. The LTV was specifically directed to the "Subject 40 acres."*

The same result likely follows (at least insofar as any meaningful damages recovery is concerned) from the Letter's inclusion of the language giving Arvest the "unilateral right to terminate" the arrangement if the final agreement was not executed and the loan proceeds disbursed by January 31, 2015. It is undisputed that the parties were still working toward an as-yet uncompleted transaction in February 2015 when the Snell email was sent. In light of the court's conclusion as to the non-existence of an enforceable contract, it is unnecessary to resolve definitively all the potential issues as to the interplay of Arvest's right to terminate with the theory of anticipatory repudiation of a contract. But suffice it to say that, giving effect to Arvest's termination rights under the agreement, plaintiffs' remedy would likely be substantially, if not entirely, eliminated.

Plaintiffs have also asserted a claim based on the theory of promissory estoppel. Their response brief does not grapple with defendant's summary judgment arguments as to that issue in any meaningful way and the court views it as confessed. L.Cv.R. 7.1. Moreover, it appears recovery on that theory would, in any event, be unavailable. A claim based on promissory estoppel requires a showing of "(1) a clear and unambiguous promise, (2) forseeability by the promisor that the promisee would rely upon it, (3) reasonable reliance upon the promise to the promisee's detriment and (4) hardship or unfairness can be avoided only by the promise's enforcement." Russell v. Bd. of Cnty. Comm'rs of Carter County, 952 P.2d 492, 503 (Okla. 1997) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 90). The contingent nature of the loan commitment involved here is inconsistent with the existence

7

of the necessary "clear and unambiguous" promise.

In light of these conclusions, it is unnecessary to address the additional, alternate grounds relied on by defendant in its motion.[5]

The court concludes summary judgment for defendant is warranted.[6]

## Conclusion

Defendant's motion for summary judgment [Doc. #72] is **GRANTED**. Judgment will enter accordingly.

**IT IS SO ORDERED.**

Dated this 21st day of November, 2016.

*[signature]*

JOE HEATON
CHIEF U.S. DISTRICT JUDGE

---

[5]*Among other things, defendant argues that Aria, as a non-party to the agreement, is not entitled to enforce it. It also asserts mitigation of damages and similar arguments, based on plaintiffs' securing financing from another lender.*

[6]*Plaintiff suggests the court has already definitively rejected some of defendant's arguments that are addressed above. It has not. The court's order on the motion to dismiss concluded the complaint stated a plausible claim, but that it was "premature to resolve the present dispute on the basis of the pleadings only." [Doc. #20]. This dispute involves a relatively complex, multi-million dollar deal and, in the court's view, warranted a more thorough description of the circumstances and discussion of the issues than had then occurred. That more thorough airing of the issues has now occurred.*